# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jessica K. Altman, : 
Insurance Commissioner of the : 
Commonwealth of Pennsylvania, : 
In her official capacity as : 
Liquidator of Healthcare : 
Providers Insurance Exchange, : 
In Liquidation, : 
      Applicant : 
              :
    v. : No. 1 HPI 2018
              : Heard: September 20, 2018
Daniel Kyler, as Administrator : 
Ad Prosequendum of the Estate of : 
Patricia Ann Averona (Deceased), : 
      Respondent : 
              :
(Ancillary matter to: : 
In Re:  Healthcare Providers : 
Insurance Exchange in Liquidation, : 
No. 1 HPI 2017) : 

**BEFORE: HONORABLE P. KEVIN BROBSON, Judge**

**OPINION BY JUDGE BROBSON**     **FILED:  October 17, 2019**

In the present litigation, the Court must determine whether the Statutory Liquidator (Liquidator) of Healthcare Providers Insurance Exchange (HPIX) had authority to intercept a $1 million settlement check in the possession of UPS for intended delivery to the plaintiffs in a civil action brought against insureds of HPIX.  After a hearing and consideration of post-hearing briefs, the Court concludes that the Liquidator acted within the bounds of her authority.

Consequently, the Court will grant the Liquidator's Application for Relief (Application).[1]

## I. INTRODUCTION

On December 18, 2017, Jessica K. Altman, then-Acting Insurance Commissioner of the Commonwealth of Pennsylvania (Commissioner Altman),[2] filed in this Court a Petition for Review in the Nature of a Complaint for Order of Liquidation (Petition for Order of Liquidation), docketed with this Court at *Altman v. Health Care Providers Insurance Exchange*, 1 HPI 2017 (Liquidation Proceeding). By order dated January 12, 2018, this Court ordered HPIX into liquidation (Order of Liquidation) under Article V of The Insurance Department Act of 1921 (Act),[3] and appointed Commissioner Altman as the Liquidator of HPIX. Relevant to the instant dispute, the Court's Order of Liquidation vested title to all of HPIX's property, assets, and rights of action (assets) in the Liquidator and declared that such assets are *in custodia legis* of the Court. (Order of Liquidation ¶ 4.) The Court further declared that it had exclusive jurisdiction over all disputes regarding title to assets purportedly owned by HPIX. (*Id.* ¶ 4(b).) Finally, in conjunction with the Order of Liquidation, the Court stayed all litigation against HPIX. (Stay Order, dated January 12, 2018). *See* Section 526 of the Act, 40 P.S. § 221.26(a) (imposing an automatic stay of litigation against insolvent insurer).

By order of July 27, 2018, and despite the stay of litigation imposed by this Court and by Pennsylvania statute, the Superior Court of New Jersey (New

---

[1] The Court treated the Application as an adversarial proceeding pursuant to Pa. R.A.P. 3783 and docketed it separately from the Liquidation Proceeding.

[2] The Senate of Pennsylvania confirmed Commissioner Altman's gubernatorial appointment on March 20, 2018.

[3] Act of May 17, 1921, P.L. 789, *as amended*, 40 P.S. §§ 221.1-.63, added by the Act of December 14, 1977, P.L. 280.

Jersey trial court or trial court), in the civil action of *Averona v. Schuitema, D.O.* (N.J. Sup. Ct., Camden Cty.-Law Div., No. L-1529-15), granted plaintiff Dominique Averona's (Averona) motion to enforce a pre-liquidation settlement agreement between Averona and Medical Mutual Insurance Company of North Carolina (Medical Mutual), HPIX, and HPIX's insureds, Larry Feinerman, M.D., and Rancocas Anesthesiology, P.A.[4]  Notably, the trial court ordered HPIX (In Liquidation)[5] or the Liquidator to transmit a settlement check in the amount of $1 million payable to Averona and her attorney within 30 days of the date of the trial court's order.  The Liquidator filed the present Application on August 23, 2018, seeking an order declaring that she is not required to comply with the July 27, 2018 order of the New Jersey trial court.

In her Application, the Liquidator asserts that the Uniform Insurers Liquidation Act (UILA)[6] requires the New Jersey trial court to honor this Court's

---

[4] Averona commenced that civil action on her own behalf and as the Administratrix *Ad Prosequendum* of the Estate of Patricia Ann Averona (Estate), her deceased mother.  In that action, Averona asserted wrongful death and survival claims, alleging that the negligence of various medical providers caused her mother's death in September 2013. (Hr'g, Averona Ex. 1 (Amended Complaint).)  The Court notes that Averona's hearing exhibits are marked "Intervenor"; for clarity, the Court will refer to Averona's exhibits as "Averona Ex. ___."  HPIX insured two of the medical providers named in the lawsuit.  By letter dated June 18, 2019, Stephen Bruccoleri, Esquire, counsel for Averona, informed the Court that Averona had passed away.  The Superior Court of New Jersey (Camden County, Chancery Division-Probate Part) appointed Daniel Kyler (Kyler) as successor Administrator *Ad Prosequendum* of the Estate.  *See* order dated July 26, 2019.  Nonetheless, for clarity purposes and unless otherwise noted, the Court will continue to refer to Respondent/Intervenor as Averona.

[5] Where appropriate, the Court uses the designation "(In Liquidation)" to indicate that status of HPIX following this Court's Order of Liquidation.

[6] The National Conference of Commissioners on Uniform State Laws approved the UILA in 1939.  68 N.Y. Jur. 2d Insurance § 415 (August 2019).  The UILA was intended to provide a "uniform system for the orderly and equitable administration of the assets and liabilities of defunct multistate insurers."  *Id.* (footnote omitted).  New Jersey has adopted the UILA; Pennsylvania has not.  *See Koken v. Reliance Ins. Co.*, 893 A.2d 70, 76 (Pa. 2006) (explaining

3

Orders of Liquidation and Stay, that full faith and credit and comity require the trial court to honor this Court's orders, that the trial court's order conflicts with this Court's exclusive *in rem* jurisdiction over HPIX's assets, and that this Court has exclusive authority to determine the validity of claims against HPIX. The Liquidator maintains that Averona must pursue any claims arising under an insurance policy issued by HPIX in the proof of claim process as delineated in the Court's Order of Liquidation and Article V of the Act.

In her response to the Application, Averona avers that she settled her claims against Medical Mutual, HPIX, and HPIX's insureds, Feinerman and Rancocas Anesthesiology, in November 2017 for the sum of $1 million (settlement funds). Averona further avers that HPIX allocated and released the settlement funds to HPIX Insurance Services, LLC, before December 18, 2017, the date that Commissioner Altman filed her petition seeking an order of liquidation of HPIX. (Averona Response ¶ 3.)[7] According to Averona, HPIX Insurance Services issued a settlement check to her (Check #1) on December 21, 2017, and then issued a replacement check to her (Check #2 or second check) on January 11, 2018.[8] Averona also avers that on January 16, 2018 (four days after this Court ordered HPIX into liquidation), the second check was "seized . . . from UPS at/or immediately before delivery . . . at the direction of the Liquidator." (*Id.* ¶ 4(5).)

---

that Article V is based on National Association of Insurance Commissioners' model act entitled "Insurer's Supervision Rehabilitation and Liquidation Model Act"); *Hall v. Michael Bello Ins. Agency*, 880 A.2d 451, 454 (N.J. Super. Ct. App. Div. 2005).

[7] Averona's Response is verified by Attorney Bruccoleri.

[8] The Court notes Averona's conflicting averments regarding the issuance date of the second check. In paragraph three of her response, Averona avers that HPIX Insurance Services issued the second check on January 1, 2018. Later, in paragraph four, Averona avers that it issued the second check on January 11, 2018. Evidence admitted during the hearing on September 20, 2018, demonstrates that the check was, in fact, issued on January 11, 2018.

Thereafter, Averona sought to enforce the settlement agreement before the New Jersey trial court. The trial court initially denied relief due to a related stay of litigation imposed in that jurisdiction. The stay imposed/recognized in New Jersey purportedly expired on June 2, 2018, and Averona re-filed her motion to enforce the settlement agreement thereafter. The trial court granted the re-filed motion and entered the July 27, 2018 order that is the subject of the Liquidator's Application presently before the Court.

This Court held a hearing in this matter on September 20, 2018.[9] At the hearing, the Liquidator introduced the testimony of Laura Slaymaker, the Pennsylvania Insurance Department's Deputy Insurance Commissioner for the Office of Liquidations, Rehabilitations and Special Funds (Slaymaker), and Richard Fee (Fee), who was employed by HPIX Insurance Services during the relevant events.[10] The Court also admitted into the record documentary evidence from both parties. At the close of the hearing, the Court advised the parties that it discerned two issues relevant to the instant dispute: (1) whether the settlement funds were assets of the HPIX (In Liquidation) estate when the Liquidator prevented delivery of the settlement check; and (2) whether a transfer of HPIX (In Liquidation) property occurred pursuant to Section 529(b)(1) of the Act, 40 P.S. § 221.29(b)(1).[11]

---

[9] In scheduling the hearing, the Court directed: "As the moving party, the Liquidator shall bear the burden of proof at the hearing and ultimate burden of persuasion on this question of whether the Liquidator is lawfully withholding settlement funds from [Averona]." (Order filed September 5, 2018.)

[10] At the time of the hearing, Fee was employed by Medical Mutual.

[11] Section 529(b)(1) of the Act addresses transfers of the insurer's property that occur after the petition for liquidation has been filed and before the receiver takes possession of the property or an order of liquidation is filed.

5

Following the hearing, the Court set a briefing schedule. Briefing is complete and the matter is ready for resolution.

## II. FINDINGS OF FACT

### A. Background

1. HPIX is an unincorporated association organized under the laws of the Commonwealth of Pennsylvania with a principal place of business in Camp Hill, Pennsylvania. (Petition for Order of Liquidation ¶ 3.)[12]

2. HPIX, which is authorized as a reciprocal and inter-insurance exchange under Sections 1001 through 1011 of Article X of the Act, 40 P.S. §§ 961-971, wrote medical professional liability insurance for physicians and surgeons located in Pennsylvania, Delaware, New Jersey, and Maryland. (*Id.* ¶¶ 4, 9.)

3. HPIX wholly owns American Healthcare Providers Insurance Services Company, LLC (AHPIS). (*Id.* ¶ 6.) AHPIS "acts as [the] attorney-in-fact to all HPIX policyholders by managing HPIX." (*Id.* ¶ 5.)

4. Medical Mutual is an insurance company licensed to do business in Pennsylvania; Medical Mutual has offices in North Carolina (Hr'g, Notes of Testimony (N.T.) at 31 (Slaymaker dir. ex.)), and Camp Hill, Pennsylvania (*Id.* at 118 (dir. ex.)).

5. On December 23, 2015, then-Pennsylvania Insurance Commissioner Teresa D. Miller approved an Assumption and Reinsurance Agreement between HPIX and Medical Mutual, authorizing HPIX to reinsure its entire schedule of policies with Medical Mutual and precluding HPIX from further

---

[12] At the hearing, the Court admitted into evidence the Petition for Order of Liquidation as Liquidator's Exhibit 1.

6

selling or assuming any insurance policies without prior written approval of the Pennsylvania Insurance Department. (Petition for Order of Liquidation ¶¶ 10, 11, and Exhibit 1 thereto (Ins. Comm'r's Order of December 23, 2015).) Consequently, Medical Mutual "assumed all in-force insurance policies of HPIX and prospective obligations of such in-force policies." (*Id.* ¶ 12.)

6. On January 1, 2016, HPIX, AHPIS, and HPIX Insurance Services executed a Claims Service Agreement (CSA) authorizing HPIX Insurance Services to provide management and claims administration services for claims arising under certain specified medical professional liability policies issued by HPIX. (Hr'g, Liq. Ex. 4 (CSA).) Pursuant to the CSA, HPIX Insurance Services performed these services as an independent contractor. (*Id.* ¶ 7.) AHPIS paid HPIX Insurance Services a monthly fee for the services. (*Id.* ¶ 2.)

7. Under the CSA, HPIX Insurance Services' duties included: creation of a file for each HPIX claim; investigation of each claim; setting and reporting loss reserves; adjusting, denying, and/or settling claims; providing all necessary reports to HPIX; and monitoring and supervising claim litigation. (*Id.* ¶ 1(b).) The CSA included "Client Instructions," which set forth parameters to guide HPIX Insurance Services in handling HPIX claims. (*Id.*, CSA Ex. A, Client Instructions.) The Client Instructions addressed topics such as setting reserves, settlement authority, assignment of defense counsel, issuance of checks, and pursuit of subrogation. (*Id.*) The Client Instructions provided in pertinent part:

> 9. <u>Final Authority</u>. Subject to the terms of the Agreement and these Client Instructions, HPIX retains final authority in all areas of claim handling and file disposition.

(*Id.*, Client Instructions ¶ 9.)

8. The CSA also included "Claims Management Guidelines," which set forth litigation standards for counsel handling HPIX claims. (*Id.*, CSA Ex. B, Claims Management Guidelines.)

9. The CSA directed HPIX Insurance Services to establish a "regular bank checking account entitled 'HPIX Insurance Services Company, LLC, as custodian for Healthcare Providers Insurance Exchange' (the '**Loss Fund Account**')." (*Id.*, CSA Ex. C, ¶ A (emphasis in original).) The CSA further provided:

> A. . . . [HPIX Insurance Services, LLC (the Company)] agrees to establish the foregoing account within 15 days after the execution of the [CSA] utilizing the HPIX taxpayer identification number . . . . The Loss Fund Account shall be used solely by the Company to make payments of Claims and to pay Allocated Loss Expenses or to receive recoveries in accordance with the terms of this Exhibit and the Agreement. Checks drawn on the account by the Company in excess of $5,000 shall be signed by two signatories who shall be employed by the Company. HPIX shall make an initial deposit into the account in an amount to be determined within 20 days after the Closing Date. As required, the account shall be replenished by HPIX in amounts sufficient to pay Claims and Allocated Loss Expenses.

> B. Unless otherwise agreed to by the parties, the Loss Fund Account shall be maintained in accordance with the foregoing for so long as the Company shall be obligated to render Services with respect to any Claim under the [CSA]. The Company may not commingle the Loss Fund Account balances with its own funds and all interest earned on account balances shall be retained in the account to pay Claims and Allocated Loss Expenses.

> C. At such time as the Company is no longer obligated to provide the Services with respect to any Claim under the [CSA], the Company will close the Loss Fund Account and return all funds in it to HPIX after payment of all of the Company's expenses.

8

D. The Company will supply to HPIX on a monthly basis the following with respect to the Loss Fund Account: a fund activity statement, the check register, a fund distribution report, an aging report, and a Bank reconciliation and statement.

(*Id.*, CSA Ex. C.)

10. Relevant to the Loss Fund Account, the CSA provided: "Subject to the Client Instructions (<u>Exhibit A</u>) and the HPIX Claims Management Guidelines, the Company shall make payments with respect to Claims and pay Allocated Loss Expenses . . . from funds in the Loss Fund Account established pursuant to <u>Exhibit B</u> . . . ." (*Id.*, CSA ¶ 2(b) (emphasis in original).)[13]

11. Fee testified on direct examination that:[14]

a. HPIX and Medical Mutual came to an agreement that HPIX Insurance Services, a subsidiary of Medical Mutual, would provide "TPA"[15] services for the run-off of HPIX claims. (N.T. at 93, 94 and 119.) Further, HPIX agreed to pay HPIX Insurance Services for these services. (*Id.*

---

[13] The reference to Exhibit B in this provision rather than Exhibit C appears to be a typographical error. (*See* Hr'g, N.T. at 102 (comment by Mr. Gagne, counsel for Liquidator).) Clearly, as written, the reference to Exhibit B does not make sense. Counsel for the Liquidator recognized this and attempted to address the mistake during direct examination of Fee. (*See id.* at 106-07.) Although Fee did not confirm that the reference to Exhibit B is a typographical error, he did state that Exhibit C to the CSA does address the Loss Fund Account set up by HPIX Insurance Services. (*Id.* at 107; *see also* N.T. at 97-99, 101.)

[14] Based on Fee's testimony, he appears to have been performing the duties of a claims adjuster.

[15] The Court construes Fee's reference to "TPA" to refer to a "third-party administrator." Generally, a third-party administrator is an entity that "handles various types of administrative responsibilities, on a fee-for-services basis, for organizations involved in cash flow programs. These responsibilities typically include claims administration, loss control, risk management information systems, and risk management consulting." www.irmi.com/term/insurance-definitions/third-party-administrator (last visited October 2, 2019).

at 120.)  The CSA set forth the obligations of HPIX Insurance Services' staff who were handling HPIX claims.  (*Id.* at 95.)

b.  HPIX Insurance Services performed the claims services required by the CSA, and he personally performed these services for the Averona claim.  (*Id.* at 95-96, 108.)

c.  HPIX Insurance Services established the Loss Fund Account in its own name, (*id.* at 99, 101, 123 (cross-examination)), and its employees had authority to sign checks on that account (*id.* at 123).

d.  HPIX funded the Loss Fund Account, and the funds in the account were to be used solely for the payment of HPIX claims and claim expenses. (*Id.* at 107-08.)  Further, neither Medical Mutual nor HPIX Insurance Services funded the Loss Fund Account.  (*Id.* at 107.)

12.  Fee testified on cross-examination that:

a.  After a claim was settled, the amount of the settlement would be wired into or paid into the Loss Fund Account in order to pay the claim of the settling party.  (*Id.* at 124.)

b.  The parties intended that monies transferred into the Loss Fund Account to pay a settlement would be used to pay the individuals that settled a claim.  (*Id.*)

13. On re-direct examination, Fee further described the nature and use of the Loss Fund Account.  He testified, in pertinent part, that the account was set aside "to have money placed in it to cover the claims and expenses" and that "anytime there was a larger amount of – a larger settlement, they would – you know, there would be money placed into the account."  (*Id.* at 153.)

10

14. HPIX Insurance Services established an account at First Citizens Bank; the account was assigned Account Number 0008XXXXX632.[16] (Hr'g, Liq. Exs. 6 and 7 (copies of Checks #1 and #2 depicting Account Number 0008XXXXX632); Averona Ex. 15 (bank statements); N.T. at 132 (Fee cross-ex.).) The First Citizens Bank account statements issued in connection with this account reflect an account titled: "HPIX Insurance Services LLC Claims Runoff Account."[17] (Account) (Averona Ex. 15.)

15. When shown Averona Exhibit 15, the First Citizens Bank statements for the Account, Fee testified: "This appears to be the HPIX Insurance Services account." (N.T. at 132 (cross-ex.).)

16. Slaymaker also testified regarding the creation of a "custodial account" to pay HPIX claims and loss expenses. (N.T. at 31 (dir. ex.).) Slaymaker's testimony was less specific and less detailed than Fee's testimony. Slaymaker testified that:

a. HPIX retained a TPA to handle claims administration and payment; Slaymaker did not know the name of the TPA, but believed that it was "Healthcare Providers something." (*Id*.)

b. HPIX funded a custodial account to pay claims and loss expenses through Medical Mutual. (*Id.*) Slaymaker did not know the name of the custodial account. (*Id.* at 43, 44, 63 (cross-ex.).)

17. The Court finds Fee's testimony credible.

---

[16] The Court has partially redacted the account number to be consistent with Section 7 of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania. *See* www.pacourts.us/public-records/public-records-policies (last visited October 2, 2019). .

[17] The Court notes that Checks #1 and #2, which were drawn on the Account, identify "HPIX Insurance Services, LLC" as the account owner.

18. Although the Court finds Slaymaker's testimony credible, her lack of knowledge regarding the details of the HPIX Insurance Services account renders her testimony of little value. The Court does find, however, that her testimony corroborates Fee's testimony that HPIX funded an account to be used by a TPA to pay HPIX's claims and loss expenses.

**B. Averona Claim**

19. HPIX issued a medical professional liability policy to Larry Feinerman, M.D., and Rancocas Anesthesiology, P.A. (N.T. at 6 (Stipulation by Liquidator's counsel); 108 (Fee dir. ex.).)

20. On April 20, 2015, Averona, as Administratrix *Ad Prosequendum* of the Estate of Patricia Ann Averona, filed a civil action in the Superior Court of New Jersey, Camden County, captioned *Averona v. Schuitema, D.O.* (N.J. Sup. Ct., Camden Cty.-Law Div., No. L-1529-15) (Averona civil action). (Averona Response to Application.) Averona commenced the civil action on behalf of her deceased mother, Patricia Ann Averona, and Averona's twin sisters, who were 12 years old at the time. Averona alleged in her civil action that the negligence of various medical providers, including Dr. Feinerman and Rancocas Anesthesiology, caused her mother's untimely death. (Hr'g, Averona Ex. 1 (Amended Complaint).)

21. At the time of decedent's death, HPIX insured Dr. Feinerman and Rancocas Anesthesiology. Fee, as an employee of HPIX Insurance Services, performed claims handling services for the Averona claim. (N.T. at 95-96, 108-09 (Fee dir. ex.).)

22. In November 2017, the parties to the Averona civil action agreed to settle Averona's claims against Dr. Feinerman and Rancocas Anesthesiology for the sum of $1 million. (*Id.* at 110.)

23. On December 20, 2017, Averona and her attorney, Stephen Bruccoleri, Esquire (Attorney Bruccoleri), executed a release, which settled, released, and discharged Averona's claims against Dr. Feinerman, Rancocas Anesthesiology, Medical Mutual, and HPIX. (*Id.* at 110; Liq. Ex. 5 (Release).) The Release provided, in relevant part:

**Form and Timing of Payment**

> 1. Upon the later of (A) the date of execution of this release if no court approval is required or (B) the date of court approval, the Centers for Medicare & Medicaid Services (hereinafter "CMS") will be queried by [Medical Mutual] to make one final determination as to whether the claimant is a Medicare beneficiary pursuant to [Medical Mutual's] obligations to protect Medicare's interests and in accordance with CMS guidelines . . . . <u>Medicare will be added as a payee on the check if any of the following is true</u> . . . .

(*Id.* at 111; Liq. Ex. 5 (emphasis in original).) According to Fee, the above language is included in all releases, especially if it appears that the claimant could be a Medicare beneficiary. (*Id.* at 112.) Fee did not know whether the Averona settlement required court approval. (*Id.*)

24. On that same day, December 20, 2017, Attorney Bruccoleri learned that HPIX was in financial trouble. (N.T. at 14.) The Court questioned Attorney Bruccoleri regarding his knowledge. In response, Attorney Bruccoleri stated:

> I got a call from defense counsel saying, Look, I sent you this release; I need you to get it to me quickly. And I said, Okay; fine. Then I did some research about a week

13

later. And about a week later, I found out that, in fact, there was a liquidation process.

(*Id.*)

25. In addition, on December 20, 2017, $1 million was transferred into the Account, described in Finding of Fact No. 14. (Averona Ex. 15 (December 2017 Account statement, page 2 of 19); N.T. at 133 (Fee cross-ex.).) Looking at the December 2017 Account statement in Exhibit 15, Fee agreed that it demonstrated that HPIX made a wire transfer into the Account on December 20, 2017 to pay the Averona settlement. (*Id.* at 133; *see* N.T. at 126 (Fee cross-ex.).) Upon review of Liquidator Exhibit 15, the Court notes that while it does reflect that $1 million was wired into the Account on December 20, 2017, the transferor and the source of those funds cannot be ascertained from the exhibit.

26. Pursuant to the Release, HPIX Insurance Services thereafter issued two checks. (*Id.* at 112 (Fee dir. ex.).) On December 21, 2017, HPIX Insurance Services drew a check from the Account for $1 million, made payable to Averona and Attorney Bruccoleri (Check #1). (*Id.* at 112; 127 (Fee cross-ex.); Liq. Ex. 6 (copy of Check #1).) The address reflected on Check #1 for HPIX Insurance Services is 700 Spring Forest Road, Suite 400, Raleigh, North Carolina. (*Id.* at 58 (Slaymaker cross-ex.); Liq. Ex. 6.) Check #1 was not delivered because the Centers for Medicare and Medicaid Services had not provided documentation regarding the existence of a Medicare lien. (*Id.* at 113 (Fee dir. ex.).) HPIX Insurance Services ultimately voided Check #1.

27. On January 11, 2018, HPIX Insurance Services issued a second check on the Account in the amount of $1 million; this check was made payable to Averona, Attorney Bruccoleri, and Medicare (Check #2). (*Id.* at 113-14, 128; Liq. Ex. 7 (copy of Check #2).)

14

28. On January 16, 2018, Check #2 was placed with UPS in Raleigh, North Carolina, for delivery to the attorney representing Dr. Feinerman and Rancocas Anesthesiology. (*Id.* at 114-15, 118.) On that same day, Check #2 was subsequently retrieved from UPS at the Liquidator's direction. (N.T. at 6 (Stipulation by Liquidator's counsel), 65-70 (Slaymaker dir. ex.), 114-19 (Fee dir. ex.).)

29. Check #2 was never delivered to Averona or her attorney, and, to date, the Liquidator has not paid the Averona settlement. (N.T. at 6 (Stipulation by Liquidator's counsel).)

30. Fee never informed Averona or Attorney Bruccoleri that HPIX was in financial trouble. (N.T. at 152 (Fee re-dir. ex.).)

31. The Court finds Fee's testimony credible.

32. The Court finds Slaymaker's testimony credible.

33. The Court finds Attorney Bruccoleri's testimony credible.

## C. HPIX Liquidation

34. Commissioner Altman placed HPIX under supervision by order dated October 16, 2017. (*See* Ex. 2 to Petition for Order of Liquidation; N.T. at 45 (Court takes judicial notice of Insurance Commissioner's order of Supervision dated October 16, 2017).)

35. On December 18, 2017, Commissioner Altman filed her Petition for Order of Liquidation, seeking to put HPIX into liquidation under Article V of the Act. (*Id.* at 30 (Slaymaker dir. ex.); Liq. Ex. 1.)

15

36. The Court granted Commissioner Altman's petition on January 12, 2018, and ordered the liquidation of HPIX. (*Id.* at 33; Order of Liquidation.[18]) The Order of Liquidation provided, in pertinent part, that:

2. . . . [The] Statutory Liquidator of HPIX [is] directed to take possession of HPIX's property, business and affairs in accordance with Article V [of the Act] and to administer them pursuant to the orders of this Court.

3. The Liquidator is hereby vested with all the powers, rights and duties authorized under Article V and other applicable statutes and regulations.

**ASSETS OF THE ESTATE**

4. The Liquidator is vested with title to all property, assets, contracts and rights of action (assets) of HPIX of whatever nature and wherever located, as of the date of filing the Petition for [Order of] Liquidation. All assets of HPIX are hereby found to be *in custodia legis* of this Court, and this Court asserts jurisdiction as follows: (a) *in rem* jurisdiction over all assets wherever they may be located and regardless of whether they are held in the name of HPIX or in any other name; (b) exclusive jurisdiction over all determinations as to whether assets belong to HPIX or to another party; (c) exclusive jurisdiction over all determinations of the validity and amounts of claims against HPIX; and (d) exclusive jurisdiction over the determination of the priority of all claims against HPIX.

5. To protect the assets of the HPIX Estate and facilitate this liquidation, the Liquidator is directed to:

a) Inform all banks, investment bankers, companies, other entities or other persons having in their possession the property of HPIX, that they must deliver these assets

---

[18] At the hearing, the Court admitted into evidence the Order of Liquidation as Liquidator's Exhibit 2.

16

immediately to the Liquidator, and not disburse, convey, transfer, pledge, assign, hypothecate, encumber or in any manner dispose of the same without prior written consent of the Liquidator.

b)  Inform all attorneys employed by or retained by or performing legal services for HPIX as of the date of this Order that, within 30 days of notification, they must report to the Liquidator the name, company, claim number (if applicable) and status of each matter they are handling on behalf of HPIX; the full caption, docket number and name and address of opposing counsel in each case; an accounting of any funds received from or on behalf of HPIX for any purpose and in any capacity; and, further, that the Liquidator need not make payment for any unsolicited report.

. . . .

d)  Inform any entity furnishing claims processing or data processing services to HPIX to maintain such services and transfer any such accounts to the Liquidator, upon her request.

. . . .

## DISTRIBUTION OF ESTATE ASSETS

9.  Any and all distribution of assets pursuant to Sections 544 [(pertaining to order of distribution of assets)] and 546 [(pertaining to distribution of assets under the direction of the court)] of Article V, 40 P.S. §§ 221.44, 221.46, including those in payment for costs and expenses of Estate administration, shall be made under the direction and approval of the Court.

(Order of Liquidation.)

37.  In conjunction with the Order of Liquidation, the Court, by order dated January 12, 2018, stayed all litigation against HPIX (In Liquidation). Specifically, the Court ordered:

17

AND NOW, this 12th day of January 2018, in light of this Court's contemporaneous orders, which grant the [P]etition for Order of L]iquidation of [the Insurance Commissioner], ordering [HPIX] to be liquidated, and declare HPIX to be insolvent as of this date, the Court hereby imposes a stay of litigation pursuant to Section 526 of Article V of the Act, 40 P.S. § 221.26 (pertaining to actions by and against the Liquidator).

(Stay Order.)

38. Slaymaker testified regarding the events that occurred after the Court ordered HPIX into liquidation. According to Slaymaker:

a. Her department notified Medical Mutual on January 12, 2018, that the Court ordered HPIX (In Liquidation) to be liquidated. (N.T. at 38 (dir. ex.).)

b. Her department learned that Medical Mutual had created the custodial account for the run-off of HPIX claims. (*Id.* at 42.) She personally never looked at the records associated with that account. (*Id.* at 51-52 (cross-ex.).)

c. Her department took steps to enforce paragraph 5a of the Order of Liquidation. (*Id.* at 35-36 (dir. ex.).) Specifically, on January 16, 2018, several employees from her department (the liquidation team) went to the HPIX (In Liquidation) office in Camp Hill and reviewed "the bank accounts and financial records to determine what belonged to HPIX as part of the liquidation." (*Id.* at 35-36; *see also* N.T. at 65 (cross-ex.).) The liquidation team included accountants. (*Id.* at 65.) The liquidation team's focus included the period after December 18, 2017, the date of the Petition for Order of Liquidation. (*Id.* at 36.)

d. When the liquidation team was at the HPIX (In Liquidation) office, they learned that a check for $1 million had been placed with UPS for

18

delivery. (*Id.* at 39-40.) Slaymaker learned about the check on January 16, 2018, as well. (*Id.* at 47 (cross-ex.).) According to Slaymaker, her department requested that the check be returned, "because it was an asset of the HPIX estate and we had a duty to recover it for the estate." (*Id.* at 41 (dir. ex.).) Slaymaker believed that the check was transferring assets out of the estate because the liquidation team accountant reviewed HPIX's financial records and determined that the check "came out of a HPIX account." (*Id.* at 64-69 (cross-ex.).)

e. Although Slaymaker was aware that HPIX had retained a TPA before HPIX was ordered into liquidation, (*id.* at 31), and that HPIX had funded a "custodial" account with its assets to pay claims and loss expenses through Medical Mutual, (*id.*), she did not know the exact name of the TPA (*id.*) or the custodial account (*id.* at 43 (cross-ex.)).[19] *See also* Finding of Fact No. 16a.

f. Slaymaker later testified that on or about January 16, 2018, she learned that the funds for the Averona settlement had been wired into the Loss Fund Account established under the CSA; she did not know when the funds were wired into the account. (*Id.* at 75.)

---

[19] In light of her lack of knowledge regarding the identity of the TPA and the name of the custodial account from which the checks were drawn, the Court questioned Slaymaker as to why she concluded that Check #2, which was retrieved on January 16, 2018, was a HPIX (In Liquidation) asset. In response, Slaymaker testified that Medical Mutual staff informed her team at the HPIX (In Liquidation) office that a check was going out and that the accountant there reviewed financial records and determined that the check "came out of a HPIX account." (N.T. at 64-69.)

Attorney Bruccoleri then posed a follow-up question: "What was the basis for this anonymous accountant's statement to you that there was a check coming out of a HPIX account?" (*Id.* at 69.) Slaymaker replied that the accountant reviewed the HPIX (In Liquidation) financial records for the bank accounts. (*Id.* at 69-70.)

g. Slaymaker was not aware that other checks had cleared the custodial account after January 16, 2018; if she had known that checks were clearing the account, she would have "stopped them to the extent that they were appropriately part of the HPIX estate." (*Id.* at 53 (cross. ex.).)

h. The money in the custodial account was ultimately transferred to the HPIX estate account. (*Id.* at 43, 52.)

39. In response to questioning by Attorney Bruccoleri, Slaymaker confirmed that she was not aware that HPIX resolved the Averona claim in November 2017, that HPIX prepared a release regarding that claim on December 20, 2017, or that "HPIX transferred the Averona settlement into a North Carolina account titled to [ ] HPIX Insurance Services." (*Id.* at 47-48 (cross-ex. (quoting question posed).)

40. Slaymaker acknowledged that the money that was transferred into the account on the same day that the Release was signed was most likely transferred into that account for the Averona claim, but she believed the money was "still within the purview of HPIX before it went out." (*Id.* at 49-51.)

41. Fee testified, in pertinent part, that:

a. He learned from his boss that someone from the Insurance Department had contacted someone in Medical Mutual's Camp Hill office and instructed that the $1 million check should not leave Raleigh or it should be returned to Raleigh if it had already left. (N.T. at 117-19 (Fee dir. ex.).)

b. He agreed that the January 2018 Account statement showed that a settlement check in the amount of $30,000 cleared the Account on

20

January 16, 2018. (*Id.* at 136-37 (Fee cross-ex.); Averona Ex. 15 (January 2018 Account statement, Check No. 1942, page 2 of 13).)[20]

c. He also agreed that in addition to Check No. 1942, other checks cleared the Account after January 16, 2018, and that the amounts of those other checks indicated that they were for payment of legal expenses. (*Id.* at 144-45 (cross-ex.).) Looking at the Account statement, Fee could not tell when those other checks were written/issued, received by the payee, cashed, or deposited. (*Id*. at 148-49 (re-direct ex.).) He also stated that he was not aware of any checks that had been voided or that were subject to a stop payment order. (*Id.* at 145.)

d. Finally, Fee agreed that the February 2018 Account statement reflected that $20 million remained in the Account. (*Id.* at 146 (looking at Averona Ex. 15 (February 2018 Account statement, page 5 of 5).) On re-direct examination, however, Fee acknowledged that the February Account statement demonstrated that the balance in the Account at the beginning of February 2018 was $878.53, and thereafter there were a number of credits and debits to the account, that when combined, totaled approximately $20 million. (*Id.* at 149-50.)[21] The Account balance at the end of February 2018 totaled zero. (*Id.* at 150.) Fee also agreed that the March 2018 Account statement reflected a zero balance. (*Id*. (looking at Averona Ex. 15).)

---

[20] The date that Check No. 1942 was written/issued cannot be discerned from the Account statement, and the Court cannot accept Attorney Bruccoleri's statement to Fee that the check was dated January 4, 2018, without corroborating evidence.

[21] The Court notes that the February 2018 Account statement reflects that a series of credits and debits occurred in the Account during February. The credits and debits were primarily in the amount of either $2,516,000 or $2,517,000.

21

42. The Court finds Slaymaker's testimony credible.

43. The Court finds Fee's testimony credible.

## D. Additional Findings of Fact

44. Based upon the parties' documentary evidence and the credited testimony, the Court finds as follows:

a. HPIX Insurance Services performed the claims handling services set forth in the CSA.

b. Pursuant to the CSA, HPIX Insurance Services established a bank checking account in order to pay HPIX claims and loss expenses.

c. Despite its title, the First Citizens Bank account titled "HPIX Insurance Services LLC Claims Runoff Account," Account Number 0008XXXXX632 (Account), is the account that HPIX Insurance Services established pursuant to the CSA and Exhibit C thereto, referred to earlier as the Loss Fund Account.

d. The Account could not be used for any purpose other than to pay HPIX claims and allocated loss expenses (loss expenses).

e. HPIX funded the Account with its own assets.

f. HPIX Insurance Services used the Account only for the payment of HPIX claims and loss expenses.

g. HPIX replenished the Account with funds when needed so HPIX Insurance Services could continue to pay HPIX claims and loss expenses.

h. On December 20, 2017, the day that Averona and Attorney Bruccoleri executed the Release, HPIX wired $1 million into the Account so HPIX Insurance Services could pay the Averona claim/settlement.

22

i. The checks HPIX Insurance Services issued on December 21, 2018, and January 11, 2019 (referred to above as Check #1 and Check #2, respectively), to satisfy the Averona settlement agreement were drawn on the Account.

j. Although the liquidation team stopped delivery of Check #2 on January 16, 2018, other checks representing payment of unidentified expenses were permitted to clear the Account after January 16, 2018. The Court credits the testimony that a $30,000 settlement check cleared the Account on the same day that the Liquidator retrieved Check #2 from UPS, but places little significance on this fact because there is no evidence to establish when that settlement check was actually written/issued.

k. The Account was closed on or about February 12, 2018. The balance of the Account was remitted to a HPIX (In Liquidation) account.

45. Considering both witnesses' testimony regarding the nature, funding, and purpose of the Account, the account parameters set forth in the CSA,[22] and that HPIX retained final authority over HPIX Insurance Services' claims handling and file disposition, the Court finds that: (a) HPIX did not intend to convey title to the funds in the Account to HPIX Insurance Services; and (2) HPIX retained title to the Account funds until title transferred to a payee.

---

[22] The Court finds the following parameters particularly relevant: (1) the account title should have indicated that it is a custodial account for HPIX; (2) the account should be established under HPIX's taxpayer identification number; (3) HPIX would initially fund the account and replenish it in sufficient amounts to allow continued payment of HPIX claims and loss expenses; (4) HPIX Insurance Services was prohibited from commingling account funds with its own funds; (5) HPIX Insurance Services could use the account only to pay HPIX claims and expenses or to receive recoveries; (6) interest earned by the account was required to remain in the account and be used to pay HPIX claims and expenses; and (7) when HPIX Insurance Services concluded its services under the CSA, the account should be closed and the balance returned to HPIX.

23

46. HPIX did not relinquish title to the $1 million that it transferred into the Account for purposes of enabling HPIX Insurance Services to issue a check to satisfy the Averona settlement/release.

47. Any additional findings made in the context of the Court's discussion below are incorporated herein.

## II. DISCUSSION

The Court begins by acknowledging that the circumstances underlying the present dispute are tragic and heartbreaking. Averona and her sisters clearly suffered an immeasurable loss when their mother passed away. In light of this misfortune and the timing of the events discussed above, the Liquidator's actions with respect to retrieval of the settlement check at issue appear harsh and extreme. Unfortunately, despite the difficult loss and hardship facing the Averona family, the outcome of this matter turns on whether the Liquidator's actions were permissible under the Act and other relevant legal authority, not whether they were compassionate.

### A. Liquidator's Authority to Administer HPIX Estate

Turning to the parties' arguments, the Liquidator defends her interception of Check #2, the Averona settlement payment, on the ground that pursuant to the Act and this Court's Order of Liquidation, she became vested with title to HPIX's assets on the date the Petition for Order of Liquidation was filed (December 18, 2017), and in her role as the liquidator of HPIX, she is both statutorily and judicially charged with marshalling and protecting HPIX's assets. According to the Liquidator, because HPIX retained title to the funds in the Account, she not only had authority to stop the check, but her action was

appropriate to ensure that no individual claimant's interests are elevated above the interests of other HPIX claimants.

If the critical fact underlying the Liquidator's argument is true, that the check at issue represented funds that were part of the HPIX estate when the Liquidator intercepted the check, the Liquidator is correct that she had the authority to prevent a transfer of the funds. The Liquidator's authority to administer an insolvent insurer's estate is quite extensive. Section 520(c) of the Act, 40 P.S. § 221.20(c), provides that once the Court orders the liquidation of an insurer and appoints the Commissioner as statutory liquidator, the liquidator

> shall be vested by operation of law with the title to all of the property, contracts and rights of action and all of the books and records of the insurer ordered liquidated, wherever located, as of the date of the filing of the petition for liquidation. [The liquidator] may recover and reduce the same to possession . . . .

The Liquidator is statutorily authorized to: (1) identify, collect and liquidate all of the insurer's assets; (2) collect all debts and moneys due the insurer; (3) sell, transfer, abandon or otherwise dispose of the insurer's property; (4) enter into contracts necessary to carry out the liquidation process; (5) exercise and enforce all rights, remedies and powers of any creditor, shareholder or policyholder; (6) prosecute actions on behalf of the insurer; and (7) perform any other acts that are necessary to collect, conserve and protect the insurer's assets and property. *See* Sections 520, 523, 527, and 534 of the Act, 40 P.S. §§ 221.20, .23, .27, and .34. Further, under the Act, the Liquidator must determine the validity, amount, and priority of all claims asserted against the insurer to ensure that the assets are distributed in a manner consistent with the Act and the Court's directives. *See* Sections 536-41 and 544-46 of the Act, 40 P.S. §§ 221.36-.41, .44-.46. As the Court observed in *Foster v. Monsour Medical Foundation*, 667 A.2d 18

(Pa. Cmwlth. 1995), "under [the statutory] scheme, the Statutory Liquidator steps into the shoes of the insurer and recoups its assets in order to protect the rights of its creditors, policyholders and shareholders." *Foster*, 667 A.2d at 20; *see also Pratter v. Penn Treaty Am. Corp.*, 11 A.3d 550, 554 n.4 (Pa. Cmwlth. 2010) (single judge op.) (noting that primary responsibility of Article V liquidator "is to marshal the assets of the insurer in liquidation and to pay, to the extent possible, the obligations of the insurer pursuant to a plan of distribution").

The General Assembly expressly enacted Article V to protect the interests of insureds, creditors, and the public by:

> "[(1)] enhanced efficiency and economy of liquidation, through clarification and specification of the law, to minimize legal uncertainty and litigation; [(2)] equitable apportionment of any unavoidable loss; [(3)] lessening the problems of interstate rehabilitation and liquidation by facilitating cooperation between states in the liquidation process . . . and [(4)] regulation of the insurance business by the impact of the law relating to delinquency procedures and substantive rules on the entire insurance business.

Section 501(c) of the Act, 40 P.S. § 221.1(c); *accord Ario v. Ingram Micro, Inc.*, 965 A.2d 1194, 1202-03 (Pa. 2009); *Koken v. Reliance Ins. Co.*, 893 A.2d 70, 82-83 (Pa. 2006). To achieve these purposes, Article V includes provisions designed to achieve equitable apportionment of the unavoidable losses that result from a liquidation. *Ario*, 965 A.2d at 1203. Therefore, assuming that HPIX retained title to the funds in the Account, and that the act of drawing the check did not effect a valid transfer of title to the funds, the Liquidator clearly had authority to intercept the check in order to take control of the funds, just as she could with any other HPIX asset.

26

## B. Title to Funds in the Account

Regarding ownership of the funds at issue, the Liquidator notes that the CSA required HPIX Insurance Services to establish a bank checking account (the Account) to enable the company to fulfill its duties as HPIX's third-party administrator. Referencing the various parameters that the CSA imposed on the checking account, the Liquidator contends that the Account was established as a custodial account for HPIX's benefit and, therefore, HPIX retained ownership of the Account funds. In support of this contention, the Liquidator asserts that the "holder of a custodial account may use those funds only for the benefit of the account beneficiary, and not for its own purposes." (Liquidator's Post-hearing Brief at 26 (citations omitted).) In response, Averona argues that because the Liquidator failed to provide documentary evidence demonstrating that HPIX wired the funds at issue into the Account, the Liquidator failed to demonstrate that the settlement funds, represented by Check #2, were part of the HPIX estate.[23]

After a review of the CSA and the witnesses' testimony, the Court finds that HPIX retained ownership of the funds in the Account.[24] The parties'

---

[23] The Liquidator does not argue that Averona's averment that HPIX allocated and released the settlement funds to HPIX Insurance Services constitutes an admission. (*See* Averona Response ¶ 3.) The Liquidator does contend in her reply brief, however, that Attorney Bruccoleri agreed during the hearing that HPIX transferred the settlement funds into the Account. Specifically, Attorney Bruccoleri posed the following question to Fee on cross-examination: "And can we agree that [ ] page 2 of 19 [of Averona Exhibit 15] demonstrates the wire transfer that was made on 12/20/17 by HPIX Insurance Services–I'm sorry, by HPIX to HPIX Insurance Services for payment of the Averona settlement?" (N.T. at 133.) Fee replied: "Yes." (*Id.*) As the Court noted in Finding of Fact No. 25, Exhibit 15 does not indicate the transferor's identity or the source of the funds.

[24] In reaching this conclusion, however, the Court notes that the cases relied on by the Liquidator, namely *Werner v. Werner*, 149 A.3d 338 (Pa. Super. 2016), and *Royal Bank of Pennsylvania v. Selig*, 644 A.2d 741 (Pa. Super. 1994), are inapposite. Although these cases support the basic principle that a custodian's use of custodial funds is restricted and generally limited to a particular purpose, the cases are factually distinguishable and do not resolve the

agreement, specifically CSA Exhibit C, demonstrates that HPIX authorized HPIX Insurance Services to create a custodial account for a specific purpose and that, consistent with the nature of a custodial account, HPIX intended to retain ownership of the funds in the account. In reaching these conclusions, the Court found the following CSA provisions dispositive. First, the CSA required HPIX Insurance Services to title the account in a manner that gave notice that it was a custodial account for HPIX. As commonly understood in a commercial setting, a "custodian" takes charge of or manages the property of another; a custodian does not take title to the property under its care and control.[25] Second, the account was

present issue of title to the Account funds. In *Werner*, the mother-custodian improperly converted her children's funds, which were held in bank accounts established under the Pennsylvania Uniform Transfer to Minors Act (PUTMA), 20 Pa. C.S. §§ 5301-5321. PUTMA provides a process for transferring property to minors and establishes the custodian's standard of care in administering the property for the minor's benefit. *Werner*, 149 A.3d at 342-43 (discussing PUTMA). Custodial property held pursuant to PUTMA is statutorily deemed to be the property of the minor child. *Id.* at 342. Clearly, the HPIX Insurance Service's bank account at issue here is not an account established under PUTMA, and PUTMA's provisions are not applicable.

In *Royal Bank*, the Superior Court addressed whether a bank could exercise its right to set-off against funds the depositor had placed with the bank in a custodial account. In resolving the issue, the Court examined a bank's common law right to exercise set-off against both general and special accounts and the terms of the parties' agreement regarding the custodial account. Here, the Court must determine who owns funds in the Account–HPIX, HPIX Insurance Services, or Averona; First Citizens Bank's interest is not at issue.

[25] Black's Law Dictionary 22 (11th ed. 2019) defines a "custodial account" as: "An account opened on behalf of someone else, such as one opened by a parent for a minor child, and [usually] administered by a responsible third party . . . ." A "custodian" is defined as: "A person or institution that has charge or custody (of a child, property, papers or other valuables)." Black's Law Dictionary 22 (11th ed. 2019). Finally, a "custodian of property" is defined as: "A custodian responsible for managing real or personal property. The custodian's duties generally include securing, safeguarding, and maintaining the property in the condition received and accounting for any changes in it." *Id.*

Although not relevant to the instant dispute, for purposes of determining a depositary bank's responsibility for transactions involving fiduciary accounts, Pennsylvania law distinguishes between custodial accounts, also referred to as special accounts, and general accounts. *Jairett v.*

28

to be established using HPIX's tax identification number, not HPIX Insurance Services' tax identification number. This suggests that HPIX intended to remain the owner of the funds for Federal income tax purposes. HPIX Insurance Services also was prohibited from commingling funds in the account with its own funds. Clearly, requiring HPIX Insurance Services to keep the Account funds separate from its own funds indicates that the parties did not intend title of the funds to transfer to HPIX Insurance Services. Similarly, HPIX Insurance Services' use of the funds was restricted under the agreement; the account could be used only to pay HPIX claims and loss expenses. If HPIX intended to relinquish its title to the funds (as opposed to only its control), restricting HPIX Insurance Services' use of the funds would be unnecessary because ownership entails full, unrestricted use.

Finally, pursuant to the CSA, HPIX used its own assets to provide the initial operating balance for the Account, and it was required to replenish the balance as needed. When the Account was closed, HPIX Insurance Services was required to return any remaining funds to HPIX. Taken together, these provisions support the conclusion that the parties to the CSA contemplated the creation of a custodial account to be used by HPIX Insurance Services, as HPIX's agent, for the payment of HPIX claims and claim-related expenses. These provisions also support the conclusion that HPIX retained ownership of the funds in the Account. The parties' conduct, as described by the witnesses, confirms this conclusion as well. Other than the anomaly regarding the name of the account, the witnesses confirmed that HPIX funded the Account, transferred money into the Account as

_First Montauk Sec. Corp._, 153 F. Supp. 2d 562, 567 (E.D. Pa. 2001) (citing in part _R.M. Bourne & Co. v. Peoples Union Bank & Tr. Co._, 172 A.2d 814 (Pa. 1961)). When a special account is established, a bank cannot accept a deposit for a particular purpose and then act in a manner that defeats the purpose for which the deposit was made. _Jairett_, 153 F. Supp. 2d at 567; _Royal Bank_, 644 A.2d at 745.

29

needed to pay claims, including the Averona claim, and the Account balance was remitted to the HPIX estate upon closure. No testimony was offered to indicate that the Account was not established and used in accordance with the requirements of the CSA.

### C. Check #2; Transfer of Title to Settlement Funds

Next, the parties disagree as to the legal significance of Check #2; specifically, whether the fact that HPIX Insurance Services issued Check #2 but interrupted delivery of the check before the payees (Averona, Attorney Bruccoleri, and Medicare) received it and cashed it was sufficient to transfer title to the promised settlement funds to the payees. The Liquidator maintains that Check #2 did not transfer title of the $1 million to the check payees because the payees never acquired possession of the check, and, more importantly, never presented the check to a bank for payment. On the other hand, Averona suggests that title to the funds effectively transferred once the check was released into interstate commerce via UPS. According to Averona, "[o]nce released, a check is paid when dated, not negotiated." (Averona Post-hearing Brief at 31 n.7 (citing *Staff Builders of Phila., Inc. v. Koschitzki*, 989 F.2d 692 (3d Cir. 1993)).)

The Uniform Commercial Code (UCC), 13 Pa. C.S. §§ 1101-9809, which governs negotiable instruments and other commercial transactions, provides the answer to when a payee takes title to funds transferred by check. After consideration of various UCC provisions, it is clear that title to funds represented by a check does not transfer from the underlying account until the check has been presented to, accepted by, and paid by the drawee bank.

A check is a type of negotiable instrument that orders a drawee bank to pay a fixed sum of money on demand. *See* 13 Pa. C.S. § 3104(f)(1) (defining

30

"check").[26]  *Accord Barnhill v. Johnson*, 503 U.S. 393, 398 (1992); *Thomas v. First Nat'l Bank of Scranton*, 96 A.2d 196, 197 (Pa. Super. 1953), *rev'd on other grounds*, 101 A.2d 910 (Pa. 1954).  A check may be payable to an identified person (in which case it is "payable to order") or to the person who has possession of it (in which case it is "payable to bearer").  13 Pa. C.S. § 3109 (pertaining to payable to order or bearer).  In general, in order to have the right to enforce a check or other instrument, a person must have either control or possession of the instrument.  13 Pa. C.S. § 3301 (pertaining to persons entitled to enforce an instrument).[27]  Although the right to enforce a check is unrelated to the issue of when title to the underlying funds actually transfers, the implicit premise

---

[26] A check is defined as, *inter alia*: "[A] draft, other than a documentary draft, payable on demand and drawn on a bank."  13 Pa. C.S. § 3104(f)(1).  A "draft," in turn, is an "order." 13 Pa. C.S. § 3104 (e).  An "order" is a "written instruction to pay money signed by the person giving the instruction."  13 Pa. C.S. § 3103(a).  The person who signs the check is known as the "drawer."  *Id.*  Finally, a "drawee" is "[a] person ordered in a draft to make payment."  *Id.*

[27] The UCC provides two exceptions to this general rule:  Section 3309 of UCC, 13 Pa. C.S. § 3309 (relating to enforcement of lost, destroyed and stolen instruments), and Section 3418(d) of the UCC, 13 Pa. C.S. § 3418(d) (relating to payment or acceptance by mistake). Section 3309(a) of the UCC provides in pertinent part:

> **(a) Enforcement**.-- a person not in possession of an instrument is entitled to enforce the instrument if:
>
> (1) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred;
>
> (2) the loss of possession was not the result of a transfer by the person or a lawful seizure; and
>
> (3) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process. . . .

Section 3309 is not applicable here because the Court has concluded that the Liquidator's interception of the check was lawful.  *See* 13 Pa. C.S. § 3309(a)(2).  Section 3418(d) is not applicable either because the check was not paid or accepted.

underlying Section 3301 is that title to the promised sum of money has not transferred before the instrument was actually delivered (or possession was interfered with); if title to the promised funds transferred before one has control or possession of the instrument, enforcement of the underlying instrument would serve no purpose.

Section 3408 of the UCC, 13 Pa. C.S. § 3408, also makes clear that neither the drawer's act of signing a check and releasing it for delivery nor a payee's possession of a check serves to effect a transfer of title to the promised funds. Section 3408 of the UCC provides: "*A check or other draft does not of itself operate as an assignment of funds* in the hands of the drawee available for its payment, and the *drawee is not liable on the instrument until the drawee accepts it*." (Emphasis added.)[28] Once accepted, however, the drawee bank is obligated to pay the draft. 13 Pa. C.S. § 3413(a) (pertaining to obligation of acceptor, general rule). Moreover, once the bank accepts the draft, the drawer is no longer liable on the *draft*. 13 Pa. C.S. § 3414(c) and UCC Comment 3 (1990). As the Superior Court observed, "[t]he acceptance of a check contemplates a promise on the part of the drawee to pay the same, and is essentially different from the payment thereof. Payment is the natural and legitimate end of a check." *Sexton v. PNC Bank*, 792 A.2d 602, 606 (Pa. Super.) (discussing distinction between acceptance and payment) (internal quotations and citation omitted), appeal denied, 814 A.2d 678 (Pa. 2002). Further, under the UCC, payment of a check discharges the underlying *obligation*.[29] 13 Pa. C.S. § 3310.

---

[28] The UCC defines "acceptance" as "the drawee's signed agreement to pay a draft as presented. It must be written on the draft and may consist of the drawee's signature alone." 13 Pa. C.S. § 3409(a).

[29] Section 3310(b) of the UCC, 13 Pa. C.S. § 3310(b), which applies to uncertified checks, provides in pertinent part:

32

The timing of the transfer of title to funds represented by a check is also addressed by Section 3420 of the UCC, 13 Pa. C.S. § 3420. Section 3420(a) of the UCC provides: "An action for conversion of an instrument may not be brought by the issuer or acceptor of the instrument or a *payee or indorsee who did not receive delivery of the instrument* . . . ." (Emphasis added.)[30] The Comment to Section 3420 of the UCC reiterates that if an instrument was not delivered to the payee, the payee has no interest in the check itself and, therefore, has no right to enforce it. According to the Comment:

> Until delivery, the payee does not have any interest in the check. The payee never became the holder of the check nor a person entitled to enforce the check. Section 3-301. Nor is the payee injured by the fraud. Normally the drawer of a check intends to pay an obligation owed to the payee. *But if the check is never delivered to the payee, the obligation owed to the payee is not affected.*

13 Pa. C.S. § 3420, UCC Comment 1 (1990) (emphasis added). Consequently, because Averona never possessed Check #2, she is precluded from asserting any claim for conversion of the check.

---

**(b) Note or uncertified check taken for obligation.**—Unless otherwise agreed and except as provided in subsection (a), if a note or an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken, and the following rules apply:

(1) In the case of an uncertified check, suspension of the obligation continues until dishonor of the check or until it is paid or certified. Payment or certification of the check results in discharge of the obligation to the extent of the amount of the check.

There is no evidence that Check #2 was certified.

[30] "Delivery" is defined as the "voluntary transfer of possession." 13 Pa. C.S. § 1201(b)(15). *See also* 13 Pa. C.S. 3203(a) (pertaining to transfer of an instrument). Comment 1 to Section 3420 of the UCC, 13 Pa. C.S. § 3420, also provides, in part, that "[t]he payee receives delivery when the check comes into the payee's possession."

Finally, the UCC's provisions governing an account owner's ability to stop payment on an item drawn on the owner's account provide further support for the conclusion that title to the $1 million never vested in the Averona payees. Pursuant to Section 4403(a) of the UCC, a customer, or other person authorized to draw on the account, may stop payment of an item drawn on the account by an order to the bank "describing the item . . . with reasonable certainty *received at a time and in a manner that affords the bank a reasonable opportunity to act on it*." 13 Pa. C.S. § 4403(a) (emphasis added). Thus, a customer may issue an effective stop-payment order at any time so long as the receiving bank has sufficient time to take action. Again, if title to the funds transferred before the check was paid and the customer's account charged, a stop-payment order would be meaningless. Here, the Liquidator's action in intercepting Check #2 is akin to issuing a stop payment order to the bank; both actions serve to prevent satisfaction of the underlying obligation such that the debt or obligation remains.

The United States Supreme Court considered the provisions of the UCC as adopted in New Mexico and reached the same conclusion regarding title to funds conveyed by check. *See Barnhill*, 503 U.S. at 400-02. Specifically, the Supreme Court granted *certiorari* in *Barnhill* to determine when a transfer of funds by check is deemed to occur under 11 U.S.C. § 547(b), the Bankruptcy Code's preference avoidance section.[31] In that case, the debtor delivered a check to a

_____

[31] Section 547 of the Bankruptcy Code authorizes the trustee to avoid any transfer made by the debtor on or within 90 days before the debtor filed the petition for bankruptcy. At the time, Section 547 provided, in pertinent part:

>    (b) Except as provided in subsection (c) and (i) of this section, the trustee
>    may avoid any transfer of an interest of the debtor in property--
>
>        . . . .
>
>        (4) made-

34

creditor on November 18; the drawee bank honored the check on November 20. The debtor subsequently filed a petition for bankruptcy under Chapter 11 of the Bankruptcy Code. Consequently, transfers that occurred on or after November 20 fell within the 90-day preference period. The trustee sought to recover the funds for the benefit of the debtor's estate, arguing that the transfer occurred on November 20, the date the drawee bank honored the check. The creditor opposed the recovery, contending that the transfer occurred on the date he received the check, November 18, which fell outside the 90-day period established under Section 547 of the Bankruptcy Code. The Court examined the rights of each party to a check transaction under the relevant provisions of New Mexico's UCC. In concluding that the transfer of interest in the debtor's funds occurred when the check was honored rather than the date of receipt, the Court opined:[32]

> A person with an account at a bank enjoys a claim against the bank for funds in an amount equal to the

> (A) on or within 90 days before the date of the filing of the petition;
>
> . . . .
>
> (e)(1) For the purpose of this section--.
>
> . . . .
>
> (B) a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee. . . .

11 U.S.C. § 547. The Bankruptcy Code also defined "transfer" to mean, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property," including "retention of title as a security interest" and "foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(54).

[32] The Supreme Court's citations to the UCC are included; in some instances, the UCC provision cited does not mirror the provisions currently in effect in Pennsylvania. Where there is a significant discrepancy between the provision cited by the Supreme Court and the UCC as adopted in Pennsylvania, this Court will note the difference.

account balance. Under the U.C.C., a check is simply an order to the drawee bank to pay the sum stated, signed by the maker and payable on demand. U.C.C. § 3-104(1), (2)(b). Receipt of a check does not, however, give the recipient a right against the bank. The recipient may present the check, but, if the drawee bank refuses to honor it, the recipient has no recourse against the drawee. § 3-409(1).[33]

That is not to say, however, that the recipient of a check is without any rights. Receipt of a check for an underlying obligation suspends the obligation "pro tanto until the instrument's . . . presentment; . . . discharge of the underlying obligor on the instrument also discharges him on the obligation." § 3-802(1)(b).[34] But should the drawee bank refuse to honor a check, a cause of action against the drawer of the check accrues to the recipient of a check "upon demand following dishonor of the instrument." § 3-122(3); *see also* § 3-413(2).[35] And the recipient of a dishonored check, received in payment on an underlying obligation, may maintain an action on either the check or the obligation. § 3-802(1)(b).[36]

*. . . [T]here can be no assertion that an unconditional transfer of the debtor's interest in property had occurred before November 20 [the date of honor]. This is because, as just noted above, receipt of a check gives the recipient no right in the funds held by the bank on the drawer's account. Myriad events can intervene between delivery and presentment of the check that would result in the check being dishonored. The drawer could choose to close the account. A third party could*

---

[33] *See* 13 Pa. C.S. § 3408 (pertaining to drawee not liable on unaccepted draft).

[34] Section 3802 of the UCC, 13 Pa. C.S. § 3802, was repealed by the Act of July 9, 1992, P.L. 507. The substance of Section 3802 now appears in Section 3310 of the UCC, 13 Pa. C.S. § 3310.

[35] Section 3122 of the UCC, 13 Pa. C.S. § 3122, was repealed by the Act of July 9, 1992, P.L. 507. Section 3414(b) of the UCC, 13 Pa. C.S. § 3414(b), however, provides that, "[i]f an unaccepted draft is dishonored, the drawer is obliged to pay the draft . . . according to its terms at the time is was issued or, if not issued, at the time it first came into possession of a holder . . . ."

[36] *See* 13 Pa. C.S. § 3310(b)(3) and UCC Comment 3 (1990).

obtain a lien against the account by garnishment or other proceedings. The bank might mistakenly refuse to honor the check.

The import of the preceding discussion . . . is that *no transfer of any part of the debtor's claim against the bank occurred until the bank honored the check* on November 20. The drawee bank honored the check by paying it. U.C.C. § 1-201(21) (defining honor); § 4-215(a).[37] At that time, the bank had a right to "charge" the debtor's account, § 4-401, *i.e.*, the debtor's claim against the bank was reduced by the amount of the check-and petitioner no longer had a claim against the debtor. Honoring the check, in short, left the debtor in the position that it would have occupied if it had withdrawn cash from its account and handed it over to petitioner. We thus believe that when the debtor had directed the drawee bank to honor the check *and* the bank has done so, the debtor has implemented a "mode, direct or *indirect* . . . of disposing . . . of property or . . . an interest in property[]" [for purposes of 11 U.S.C. § 101(54)].

*Barnhill*, 503 U.S. at 398-400 (some citations omitted) (footnotes omitted and added) (emphasis added).[38]

---

[37] While the Court did not discern a definition of "honor" in Pennsylvania's UCC, payment is defined in Section 3602(a) of the UCC, 13 Pa. C.S. § 3602(a), as "an instrument is paid to the extent payment is made by or on behalf of a party obliged to pay the instrument and to a person entitled to enforce the instrument." *See also* 13 Pa. C.S. § 4215(a) (pertaining to final payment of item by payor bank).

[38] The "date of honor" rule also has been applied by bankruptcy courts under Section 549 of the Bankruptcy Code, 11 U.S.C § 549, which permits the trustee to avoid a transfer of the debtor's property that occurs after the commencement of the case if the transfer is not authorized by the Bankruptcy Code or the court. *See Guinn v. Oakwood Props., Inc.*, 203 F.3d 406, 409-10 (6th Cir. 2000) (holding that check received pre-petition but paid post-petition constitutes a transfer of property on date check honored for purposes of 11 U.S.C. § 549; *Buckeye Check Cashing, Inc. v. Meadows*, 396 B.R. 485, 493-94 (2008) (holding that for purposes of 11 U.S.C. § 549, estate's interest in funds transferred when check honored post-petition, not when check delivered to creditor pre-petition); *Wittman v. State Farm Life Ins. Co.*, 176 B.R. 924, 928-29 (1994) (same).

Thus, based upon the UCC provisions noted above, the Court concludes that neither the fact that HPIX Insurance Services issued Check #2, nor the additional fact that it placed Check #2 with UPS for delivery, served to transfer ownership of the underlying funds from HPIX to the payees.[39]

### D. Settlement Funds Held in Constructive Trust

Averona next asserts that under the circumstances, HPIX Insurance Services held the settlement funds in constructive trust for the Averona parties. In support of this contention, Averona notes that Fee testified that $1 million was deposited into the Account for the sole purpose of paying the Averona settlement, and that HPIX Insurance Services intended to transfer the funds to the Averona parties, not the Liquidator. According to Averona, permitting the Liquidator to retain the funds unjustly enriches the Liquidator and other creditors to their detriment. Finally, relying on *American Security Bank v. Kaneshiro*, 688 P.2d 254 (Haw. 1984), Averona maintains that the Liquidator is prohibited from taking control of funds deposited into an account for a particular purpose.

"A constructive trust arises where a person holds title to a property subject to an equitable duty to convey it to another on the ground that he or she

---

[39] In reaching this conclusion, the Court rejects Averona's claim that a check "is paid when dated, not negotiated." (Averona's Post-hearing Brief at 31 n.7 (citing *Staff Builders*.)) In *Staff Builders*, the United States Court of Appeals for the Third Circuit did not address when title to funds conveyed by check transfers to the payee. Rather, the appeals court determined whether the debtor made a timely payment under a settlement agreement when it delivered a post-dated check to the creditor. In that context the appeals court observed, under Section 3-802(1)(a) of the UCC, "the general rule is that when a creditor accepts a check, 'the obligation is suspended pro tanto' until the check is honored by the bank. Thus, 'when the check is paid, the payment of the underlying debt becomes absolute and it is deemed paid as of the date of the giving of the check.'" *Staff Builders*, 989 F.2d at 694 (citation omitted). As noted above, Section 3802 of the UCC has since been repealed; the substance of that provision now appears in Section 3310 of the UCC.

would be unjustly enriched if permitted to retain it." *Tenco Excavating, Inc. v. First Sealord Sur., Inc.*, 78 A.3d 1181, 1187 (Pa. Cmwlth. 2013). Before a constructive trust can be imposed, however, the owner of the property must have acquired title to such property in a manner that created an equitable duty in favor of the person benefiting from the trust. *Shoemaker v. Lehigh Twp.*, 676 A.2d 216, 220 (Pa. 1996). The necessity for the trust may arise from circumstances involving breach of a confidential relationship by the transferee, or fraud, duress, undue influence or mistake. *Roberson v. Davis*, 580 A.2d 39, 41 (Pa. Super. 1990).

The circumstances here do not warrant imposition of a constructive trust. While the Liquidator's interception of Check #2 is surprising, her actions in these circumstances were not unauthorized. As noted, under the CSA, HPIX retained ownership of the funds in the Account. The Liquidator became vested with title and authority over HPIX's assets on the date the Petition for Liquidation was filed. Moreover, the Court specifically directed the Liquidator to take possession of HPIX's property. (*See* Order of Liquidation ¶ 2.) Given that the title to the funds in the Account vested in the Liquidator, she had authority to take possession and control of the Account funds on January 16, 2018, the date she intercepted the check.

The Court finds no merit in Averona's argument that HPIX Insurance Services held the funds in trust for her. Although it is evident that HPIX Insurance Services intended to pay the Averona settlement after sufficient funds were transferred into the Account (indeed, it drew Check #1 the day after the funds were transferred), it did not segregate those funds in anticipation of that payment. Rather, as the record demonstrates, HPIX transferred $1 million into the same checking account that HPIX Insurance Services used for the payment of *all* claims

39

and expenses; the transferred funds were then commingled with the other monies in the account. Further, the limitations on HPIX Insurance Services' use of the Account funds served to confirm and protect HPIX's ownership of the funds; the restrictions were not imposed to protect HPIX claimants. The Court, therefore, concludes that HPIX Insurance Services acquired possession of the funds as part of its normal business practices and not under circumstances "that created an equitable duty in favor" of Averona.

Finally, the estate is not unjustly enriched by the Liquidator's action. The Liquidator's interception of the check ensures that the estate assets will be equitably apportioned among all claimants and that the interests of some claimants are not elevated above others of the same class and priority. Accordingly, the Court concludes that the elements necessary to establish a constructive trust have not been met.[40]

### E. Transfer of Property under Section 529(b) of the Act, 40 P.S. § 221.29(b)

As directed by the Court, both parties have addressed whether a valid transfer of property occurred under Section 529(b)(1) of the Act, 40 P.S. § 221.29(b)(1). Section 529 of the Act provides in relevant part:

> (b) After a petition for rehabilitation or liquidation and before either the receiver takes possession of the property of the insurer or an order of rehabilitation or liquidation is granted:
>
> > (1) A transfer of any of the property of the insurer, other than real property, made to a person

---

[40] Averona's reliance on *American Security Bank* is misplaced and does not command a different result. In that case, the court addressed a bank's failure to adhere to the depositor's special instructions regarding the use of the depositor's funds placed in an account with the bank. The court did not address the ability of the owner or custodian of an account to exercise control over its own funds.

40

acting in good faith shall be valid against the receiver if made for a present fair equivalent value, or, if not made for a present fair equivalent value, then to the extent of the present consideration actually paid therefor, for which amount the transferee shall have a lien on the property so transferred.

(2) A person indebted to the insurer or holding property of the insurer may, if acting in good faith, pay the indebtedness or deliver the property, or any part thereof, to the insurer or upon his order, with the same effect as if the petition were not pending.

(3) A person having actual knowledge of the pending rehabilitation or liquidation shall be deemed not to act in good faith.

(4) A person asserting the validity of a transfer under this section shall have the burden of proof. Except as elsewhere provided in this section, no transfer by or in [sic] behalf of the insurer after the date of the petition for liquidation by any person other than the liquidator shall be valid against the liquidator.

(c) Nothing in this article shall impair the negotiability of currency or negotiable instruments.

Article V, through Section 503 of the Act, 40 P.S. § 221.3, defines a "transfer" to include

the sale and every other and different mode, direct or indirect, of disposing of or of parting with property or with an interest therein, or with the possession thereof or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily, by or without judicial proceedings. The retention of a security title to property delivered to a debtor shall be deemed a transfer suffered by the debtor.

The Liquidator contends that HPIX's deposit of funds into the Account did not constitute a transfer under Section 529(b)(1) because HPIX remained the owner of the funds in the Account, HPIX Insurance Services held the funds solely as a custodian for HPIX in order to fulfill its responsibilities under the

41

CSA, and HPIX did not intend to part with the funds until a check drawn on the account was ultimately paid. The Liquidator also argues that even if a transfer did occur, the transfer was to HPIX Insurance Services, not Averona.

Averona argues on the other hand that the deposit of funds in the Account constitutes a valid transfer against the Liquidator because she lacked actual knowledge of the pending liquidation petition, and her release of claims against HPIX's insureds constituted fair equivalent value in exchange for the settlement amount.

After a review of the record and the statutory definition of "transfer," it is clear that a transfer for purposes of Section 529(b)(1) of the Act did not occur. First, the evidence demonstrates that HPIX never absolutely or conditionally relinquished its interest in the funds that it deposited into the Account. As already noted, HPIX Insurance Services held the funds as a custodian for HPIX. Because HPIX intercepted Check #2 before it was paid, a transfer of HPIX's interest in the funds never occurred. Even assuming HPIX had relinquished its interest in the funds to HPIX Insurance Services, its transfer of the funds into the Account would not be valid against the Liquidator because it was not made for present fair equivalent value.[41] Finally, because payment did not occur, Section 529(c) of the

_____

[41] Because the Court has concluded that no transfer of interest in the $1 million occurred, the Court need not decide whether Averona met the requirement of present fair equivalent value. There is some authority to suggest, however, that if a transfer had occurred, it was not in exchange for present fair equivalent value. As courts have observed, because many state insurance insolvency statutes stem from federal bankruptcy law, courts often turn to that decisional authority to aid their interpretation of a similar insurance liquidation provision. *See Ario*, 965 A.2d at 1203; *Wilcox v. CSX Corp.*, 70 P.3d 85, 90 (Utah 2003); *Covington v. Univ. Hosp. of Cleveland* (Ohio Ct. App., No. 01AP-1140, filed August 20, 2002), 2002 WL 1935918 (unreported). As our Supreme Court noted in *Ario*, because Article V was enacted in 1977, the Bankruptcy Act of 1898, rather than the Bankruptcy Code of 1978, is the most relevant. *Ario*, 965 A.2d at 1203.

42

Act, 40 P.S. § 221.29(c), which preserves the negotiability of negotiable instruments, is not at issue.[42]

### F. Application of Promissory Estoppel

Next, Averona suggests that inasmuch as both HPIX and the Pennsylvania Insurance Department were aware of HPIX's precarious financial status at the time the underlying civil action was mediated and settled, promissory estoppel should apply to preclude the Liquidator from retaining the settlement funds. "Promissory estoppel enables a person to enforce a contract-like promise that would be otherwise unenforceable under contract law principles." *Peluso v. Kistner*, 970 A.2d 530, 532 (Pa. Cmwlth. 2009) (citation omitted); *see also Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000) (noting that where parties' agreement is unenforceable due to lack of consideration, doctrine of promissory

---

In 1938, Congress amended Section 70 of the Bankruptcy Act of 1898 to add subsection (d). *See* former 11 U.S.C. § 110 (subsequently repealed in 1978). *See Lake v. N.Y. Life Ins. Co.*, 218 F.2d 394 (4th Cir. 1955), *cert. denied*, 349 U.S. 917 (1955); 4B COLLIER ON BANKRUPTCY ¶¶ 70.67-.68, at 741-746.1 (14th ed. 1978). Section 70(d) of the Bankruptcy Act is virtually identical to Section 529(b) of Article V. In the bankruptcy context, the requirement of "present fair equivalent value" has been interpreted to "protect the estate of the debtor from depletion during the pendency of the [bankruptcy] petition, while permitting persons to carry on normal business affairs with the bankrupt without fear of a later suit by the trustee to recover property transferred by the bankrupt for full value." *Kass v. Doyle*, 275 F.2d 258, 261 (2d Cir. 1960). Section 70(d) does not afford "protection to the payment of an antecedent debt by the bankrupt, since validation of such payment[] would not increase the ability of the bankrupt to carry on every day business transactions . . . and would deplete the assets of the estate available for other creditors." *Id.* at 262 (internal citation omitted). Applying this construction of Section 70(d), some courts have held that a post-petition payment to settle a personal injury action or judgment that arose pre-petition does not meet the "present fair equivalent value" requirement. *See Lehman v. Cameron*, 139 N.Y.S.2d 812 (1955). *See* 4B COLLIER ON BANKRUPTCY ¶ 70.68[4], at 750 n.18b.

[42] *See, e.g.*, *Covington* (holding that rehabilitator could not recover funds from proceeds of checks issued pre-petition but paid after rehabilitation order because payees were holders in due course; permitting recovery of funds would impair negotiability of negotiable instrument contrary to statutory provision).

43

estoppel may be invoked to avoid injustice by enforcing promise). In order to maintain an action in promissory estoppel, the aggrieved party must demonstrate that: "(1) the promisor made a promise that would reasonably be expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Peluso*, 970 A.2d at 533. Finally, promissory estoppel is the basis for an independent cause of action. *Id.*

Here, promissory estoppel is not an available remedy because the parties entered into a valid, enforceable contract when Averona and Attorney Bruccoleri executed the release in exchange for the promised payment of $1 million. While the liquidation of HPIX prevented HPIX from paying the promised sum, promissory estoppel cannot be used to exact a payment from the insolvent estate that is not otherwise permitted under the Act. *See First Fed. Sav. and Loan Ass'n of Lancaster v. Swift*, 321 A.2d 895, 897 (Pa. 1974) ("Equity follows the law."); *see also Bd. of Sch. Dirs. v. Kassab*, 450 A.2d 282, 286 (Pa. Cmwlth. 1982) ("A court of equity has no more right than has a court of law to act on its own notion of what is right in a particular case; it must be guided by the established rules and precedents.") (quoting 27 Am. Jur. 2d Equity § 118 (1966)). Moreover, while the Court's sympathies lie with the Averona family, they are not without any remedy. Kyler can pursue a claim with the appropriate guaranty association and seek any additional recovery by submitting a proof of claim with the Liquidator. Unfortunately, to allow this statutory process to be circumvented would be inequitable to other claimants. As this Court noted in a somewhat analogous situation:

44

[Article V] imposes [on the Liquidator] the duty to act with a broader view toward minimizing inevitable financial harm to *all* policyholders, creditors and the general public. Implicit is the realization that when an insurance company is under threat of insolvency, or in a financially "hazardous" condition, individual interests may need to be compromised in order to avoid greater harm to a broader spectrum of policyholders and the public.

. . . Here, our General Assembly has decided as a matter of public policy that the [Liquidator] must treat all policyholders, claimants and creditors of financially distressed insurers in an orderly and predictable fashion prescribed by the statute. We conclude that the law entitles the [claimants, who have a judgment against the insolvent insurer's insured] only to the protection provided by the statute.

*Vickodil v. Cmwlth.*, 559 A.2d 1010, 1013 (Pa. Cmwlth. 1989) (emphasis in original, statutory citations omitted).

### G. Superior Court of New Jersey's Order Directing Payment

Finally, because the Court has concluded that the settlement funds remained an asset of the estate, it is necessary to address the effect of the New Jersey trial court's July 27, 2018 order directing HPIX or the Liquidator to pay the settlement funds. The Liquidator maintains that both principles of full faith and credit and comity required the trial court to honor the stay the Court imposed pursuant to Section 526 of the Act, 40 P.S. § 221.26. Averona argues in response that the trial court's order should be enforced because the Liquidator submitted to the jurisdiction of the trial court when she opposed the motion to enforce the settlement agreement, and the trial court had discretion to disregard the stay because Pennsylvania has not adopted the Uniform Insurers Liquidation Act.

There is a split of authority regarding whether an order staying liquidation against an insurer in liquidation or rehabilitation is entitled to full faith

45

and credit under Article IV, Section 1 of the United States Constitution.[43]  In some instances, the courts have afforded full faith and credit to a stay because the domiciliary state of insolvency is a reciprocal state under the Uniform Insurers Liquidation Act.  *See Herstam v. Bd. of Dirs. of Silvercreek Water & Sanitation Dist.*, 895 P.2d 1131 (Col. Ct. App. 1995).  Others have given the stay full faith and credit without considering the substance of the domiciliary state's insolvency statute.  *See Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691 (1982); *Bryant v. Shields, Britton & Fraser*, 930 S.W.2d 836 (Tex. Ct. App. 1996); *Integrity Ins. Co. v. Martin*, 769 P.2d 69 (Nev. 1989).

The appellate courts of New Jersey have expressly declined to afford full faith and credit to a stay entered by the domiciliary state supervising insolvency proceedings.  *See Hall v. Michael Bello Ins. Agency, Inc.*, 880 A.2d 451 (N.J. Super. Ct. App. Div. 2005); *Aly v. E.S. Sutton Realty*, 822 A.2d 615 (N.J. Super. Ct. App. Div. 2003).[44]  Rather, recognizing the importance of centralized insolvency proceedings, New Jersey courts have honored a stay entered by a

---

[43] The United States Constitution requires that full faith and credit "shall be given in each State . . . to the judicial [p]roceedings of every other State." U.S. Const. art. IV, § 1.  "The Full Faith and Credit Clause . . . precludes a party from attacking collaterally a judgment of one state by attempting to re-litigate the underlying dispute resolved by that judgement in another state." *Ala. Ins. Guar. Ass'n v. Reliance Ins. Co. in Liquidation*, 100 A.3d 702, 706-07 (Pa. Cmwlth. 2014) (emphasis in original omitted), *aff'd*, 121 A.3d 954 (Pa. 2015).  When full faith and credit applies, a state must give a judgment the same *res judicata* effect the judgment would be afforded in the jurisdiction where it was entered.  *Id.*

[44]  In *Aly*, the Superior Court of New Jersey declined to give full faith and credit to this Court's stay of litigation against Legion Insurance Company in Rehabilitation because the stay was only temporary at the time. Subsequently, in *Hall*, the Superior Court of New Jersey acknowledged that its decision in *Aly* rested on the interlocutory nature of the stay but did not address whether the permanent stay challenged in *Hall* was entitled to full faith and credit. Rather, the court enforced the stay on the basis of comity.

foreign state on the basis of comity. *See Hall*, 880 A.2d at 455-57; *Aly*, 882 A.2d at 618-19, 22; and *Superintendent of Ins. v. Int'l Equip. Leasing, Inc.*, 588 A.2d 883 (N.J. Super. Ct. App. Div. 1991).[45]  Other courts have taken this approach as well. *See Mantero-Antienza, M.D. v. Salvador*, 807 So.2d 163 (Fla. Dist. Ct. App. 2002); *Am. Bonding Co. v. Coastal Metal Sales, Inc.*, 679 So.2d 1250 (Fla. Dist. Ct. App. 1996); *Pub. Serv. Truck Renting, Inc. v. Ambassador Ins. Co.,* 572 N.Y.S.2d 559 (N.Y. App. Div. 1991); *Allied Fid. Ins. Co. v. Ruth*, 790 P.2d 206 (Wash. Ct. App. 1990) (affording comity to stay entered by reciprocal state).  In *Hall*, the court opined:

> Experience has demonstrated that, in order to secure an economical, efficient, and orderly distribution of the assets of an insolvent corporation for the benefit of all creditors and stockholders, it is essential that the title, custody, and control of the assets be intrusted to a single management under the supervision of one court.  Hence other courts, except when called upon by the court of primary jurisdiction for assistance, are excluded from participation.  This should be particularly true as to proceedings for the liquidation of insolvent insurance companies, for the reasons adverted to by Mr. Justice Cardozo in *Clark v. Williard*, 292 U.S. 112, 123-24 (1934)] [*e.g.*, that insurance companies, being excluded from bankruptcy, would be required to "submit to dismemberment, however great the waste or inequality," if receivers are not appointed with powers to conserve and distribute assets].

*Hall*, 880 A.2d at 454-55 (quoting *Ballesteros v. N.J. Prop. Liab. Ins. Guar. Ass'n*, 530 F. Supp. 1367, 1371 (D.N.J.), *aff'd*, 696 F.2d 980 (3d Cir. 1982) (internal

---

[45] The Superior Court's decisions did not turn on whether the domiciliary state was a reciprocal state under the Uniform Insurers Liquidation Act. *See Hall*, 880 A.2d at 455 n.8.  The Superior Court has noted, however, that Article V is substantially similar to New Jersey's insolvency statute requiring that Pennsylvania be entitled to reciprocal status. *Venetsanos v. Zucker, Facher & Zucker*, 638 A.2d 1333, 1338 (N.J. Super. Ct. App. Div. 1994).

quotations and citations omitted)). The *Hall* court further recognized that the adoption of the Uniform Insurers Liquidation Act, N.J.S.A. 17:30C-1 to -31, demonstrated the "State's recognition of the importance of centralizing the management of delinquency proceedings in the courts of one state and avoiding interference with that management." *Id.* at 454.

Despite recognizing the value of centralized management of liquidation proceedings and the necessity of affording comity to the domiciliary state's proceedings and orders, New Jersey courts have permitted exceptions to the stay when individual circumstances demonstrate significant hardship, including that of extreme and immediate financial emergency. *See Aly*, 822 A.2d at 625-26. Apparently, the New Jersey trial court concluded that the circumstances of this case presented a sufficient hardship warranting an exception to this Court's Stay. Although this Court does not have jurisdiction to review the propriety of that decision, it is not bound by the trial court's order directing payment. In supervising this insolvency, this Court cannot approve any distribution of estate assets that does not comply with Article V's provisions. *See* Section 546 of the Act, 40 P.S. § 221.46.[46] Regrettably, advancing the Averona claim above that of other claimants would violate the principles of fairness and equitable apportionment of assets underpinning Article V.

---

[46] The Court must approve any distribution of the insolvent insurer's assets. Section 546 of the Act provides, in part:

> Under the direction of the court, the liquidator shall pay distributions in a manner that will assure the proper recognition of priorities and a reasonable balance between the expeditious completion of the liquidation and the protection of unliquidated and undetermined claims, including third party claims. . . .

48

## IV. CONCLUSION

Accordingly, the Court will not authorize the Liquidator to pay $1 million from the estate assets to satisfy the Averona settlement or the New Jersey trial court's order. In order to seek any recovery in satisfaction of the settlement agreement or payment in satisfaction of a claim, Kyler must submit a proof of claim to the Liquidator in accordance with the proof of claim process established under Article V of the Act.

_____
P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jessica K. Altman,                            :
Insurance Commissioner of the                 :
Commonwealth of Pennsylvania,                 :
In her official capacity as                   :
Liquidator of Healthcare                      :
Providers Insurance Exchange,                 :
In Liquidation,                               :
                           Applicant          :
                                              :
                v.                            :    No. 1 HPI 2018
                                              :
Daniel Kyler, as Administrator                :
Ad Prosequendum of the Estate of              :
Patricia Ann Averona (Deceased),              :
                          Respondent          :
                                              :
(Ancillary matter to:                         :
In Re:  Healthcare Providers                  :
Insurance Exchange in Liquidation,            :
No. 1 HPI 2017)                               :

# **O R D E R**

AND NOW, this 17th day of October, 2019, following a hearing and the submission of post-hearing briefs on the Liquidator's Application for Relief, seeking an Order declaring that she is not required to comply with the Superior Court of New Jersey's July 27, 2018 order in the civil action of *Averona v. Schuitema, D.O.* (Sup. Ct. N.J., Law Div.-Camden Cty., No. L-1529-15), which directed Healthcare Providers Insurance Exchange or the Liquidator to pay $1 million to Dominique Averona, Administratrix *Ad Prosequendum* of the Estate of Patricia Ann Averona (Deceased), and her attorney, Stephen Bruccoleri,

Esquire, within 30 days of the date of the trial court's order, the Court hereby declares and orders as follows:

1. The Liquidator's Application for Relief is GRANTED.

2. The Court will not approve the distribution of $1 million from the HPIX estate in order for the Liquidator to comply with the Superior Court of New Jersey's July 27, 2018 order.

3. The Liquidator shall not issue a check in the amount of $1 million from the HPIX estate payable to Daniel Kyler, Administrator *Ad Prosequendum* of the Estate of Patricia Ann Averona (Deceased), and Stephen Bruccoleri, Esquire as directed by the Superior Court of New Jersey in its July 27, 2018 order.

4. Daniel Kyler, as Administrator *Ad Prosequendum*, may file a proof of claim with the Liquidator pursuant to Article V of The Insurance Department Act of 1921, Act of May 17, 1921, P.L. 789, *as amended*, added by the Act of December 14, 1977, P.L. 280, 40 P.S. §§ 221.1-.63.

5. The Liquidator shall evaluate any proof of claim filed by Mr. Kyler in connection with this matter and issue a notice of determination as expeditiously as possible.

_____
P. KEVIN BROBSON, Judge